NOTICE

Decision filed 09/22/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180017-U

NO. 5-18-0017

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 16-CF-184 |
| | ) | |
| BRANDON S. KEPPLER, | ) | Honorable |
| | ) | Bradley T. Paisley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We reverse defendant's conviction and sentence and remand for a new trial where defendant was denied effective assistance of counsel when defense counsel acquiesced, as part of unsound trial strategy, to the State's introduction of certain other-crimes evidence; repeatedly failed to make, or made untimely, objections to inadmissible other-crimes evidence; elicited further other-crimes evidence; and failed to move to strike highly prejudicial testimony concerning defendant's sex offender status that had been previously ruled inadmissible by the circuit court.

¶ 2    Defendant, Brandon S. Keppler, appeals his conviction and sentence after a jury trial in the circuit court of Christian County, Illinois, in which he was found guilty of one count of criminal sexual abuse (720 ILCS 5/11-1.50(a)(2) (West 2016)) of M.C., a minor, and subsequently sentenced to seven years' imprisonment to be followed by four years of

1

mandatory supervised release (MSR). On appeal, defendant argues that his defense counsel's deficient performance deprived him of his right to a fair trial and a verdict worthy of confidence. For the following reasons, we reverse defendant's conviction and sentence and remand for a new trial.

¶ 3                                                    I. Background

¶ 4     The facts necessary to our disposition of this appeal are as follows. On August 19, 2016, defendant was charged by information with one count of criminal sexual abuse (720 ILCS 5/11-1.50(a)(2) (West 2016)), alleging that defendant, on or about February 6, 2016, knowing the minor victim, M.C., could not consent, knowingly grabbed M.C.'s buttocks and vagina over her clothing and reached his hand under her shirt to touch her breasts over her bra. Defendant's charge was elevated to a Class 2 felony as a result of a prior Class 2 conviction (2000-CF-71) for aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 2000)) in Clay County, Illinois.

¶ 5     On January 6, 2017, at defendant's preliminary hearing, the State called James McWard, a sheriff's deputy in the Christian County sheriff's office, to testify. Testimony was adduced that M.C. had informed Deputy McWard in a March 30, 2016, forensic interview that she drank alcohol on February 5, 2016, and February 6, 2016, without defendant's knowledge. Testimony was also adduced that M.C. informed Deputy McWard that defendant told her he was a registered sex offender.

¶ 6     Two weeks later on April 15, 2016, Deputy McWard interviewed M.C. again. Unlike the March 30, 2016, forensic interview, M.C. was visibility upset and crying while she recounted the events of February 6, 2016. Inconsistent with the March 30,

2

2016, interview, M.C. stated that defendant and his wife, Winnie Keppler, had provided alcohol to her and several other female minors. Additionally, M.C. stated that defendant had encouraged her to take eight shots of alcohol that night. At around 1:30 a.m., M.C. used the bathroom located inside of defendant's home. When M.C. exited the bathroom, defendant was standing nearby. Upon his request, M.C. walked over to defendant, at which time defendant pulled M.C.'s body close to his and used both of his hands to grab her buttocks over her pants. As M.C. attempted to pull away, defendant pulled her closer, reached his hand up her shirt to touch her breasts, and grabbed M.C.'s vagina over her clothing. M.C. told Deputy McWard that she lied on March 30, 2016, because she was afraid of defendant and embarrassed by the incident. Following the preliminary hearing, the circuit court found probable cause and set defendant's case for a pretrial hearing.

¶ 7 On May 11, 2017, defendant, represented by counsel, filed a motion *in limine* to exclude the following evidence at defendant's jury trial: (1) prior criminal felony convictions that were more than 10 years old; (2) defendant's sex offender registration from a prior conviction in Clay County, Illinois (2000-CF-71); and (3) allegations made by defendant's stepdaughter, R.K., of sexual misconduct. Defendant argued that the prejudicial impact would outweigh any probative value if the above-mentioned evidence was introduced at trial. The State did not file pretrial motions.

¶ 8 On June 2, 2017, defendant filed a second motion *in limine* that was similar to the first motion but included additional detail as to R.K.'s allegations of sexual misconduct and physical abuse by defendant. The motion indicated that defendant had not been criminally charged with respect to these allegations, although a hearing with the Illinois

3

Department of Children and Family Services (DCFS) had been scheduled for a future date.

¶ 9     On July 6, 2017, the circuit court held a motion hearing. After noting that the State had not filed any pretrial motions, the court addressed defendant's May 11, 2017, motion *in limine*. The court continued defendant's motion hearing to August 7, 2017, and also scheduled the final pretrial hearing for that day.

¶ 10     On August 7, 2017, the State filed a notice of intent to offer other-crimes evidence against defendant pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2014)). Specifically, the State intended to offer evidence that defendant had been convicted of the offense of aggravated criminal sexual abuse in 2001 against an unnamed victim between the ages of 13 and 16 (2000-CF-71), and, as a result, defendant was required to register as a sex offender. The State intended to offer this prior conviction for any relevant purpose, including propensity, given this prior bad act was against a victim in the same age group as M.C. Additionally, to show defendant's propensity to commit sex crimes against minors, the State intended to offer evidence that defendant had sexually abused and/or assaulted his stepdaughter R.K. five years earlier. Although the circuit court was scheduled to hold defendant's final pretrial hearing, it continued the hearing to August 28, 2017.

¶ 11     On August 28, 2017, the circuit court held a final pretrial hearing on all pending motions, with particular focus on the State's notice of intent to introduce other-crimes evidence. The State sought to introduce all evidence contained in the notice of intent, as well as the specifics of defendant's sexual abuse and/or assault against R.K., which

4

would include R.K.'s testimony that (1) defendant had performed oral sex on her when she was 12 years old and (2) R.K. and defendant engaged in "underwear races" by the encouragement of defendant. In determining whether to admit R.K.'s testimony, the court weighed the factors set forth in section 115-7.3(c) of the Code (725 ILCS 5/115-7.3(c) (West 2014)). In weighing these factors, the court determined that defendant's alleged sexual abuse of R.K. was sufficiently similar in nature and not too remote in time to defendant's charged sexual abuse of M.C. In particular, R.K. and M.C. were friends between the ages of 12 and 16, neither act involved penetration nor forced activity, and defendant had used coercive language to elicit compliance from the minors. The court considered the two instances of sexual abuse to be "somewhat tied together," given both victims disclosed the abuse in 2016. Based upon the totality of the circumstances, the court determined that the potential prejudice of admitting the other-crimes evidence of defendant's prior bad acts did not substantially outweigh the probative value. The court, however, granted defendant's motion *in limine* to exclude his prior 2001 conviction and the resulting sex offender registration requirement.

¶ 12   On September 11, 2017, the circuit court held defendant's three-day jury trial. The following factual recitation is taken from the evidence adduced at defendant's jury trial. We recite only those facts necessary to our resolution of the issues on appeal.

¶ 13                               A. Testimony of M.C.

¶ 14   M.C., 18 years old at the time of trial, testified to the following. M.C. was currently enrolled in an alternative school called SEAK, which was a "Social

5

Emotionally Alternative Program." At the time of the incident in 2016, M.C. attended Sangamon Valley High School.

¶ 15    The State questioned M.C. about the events of February 5, 2016, and February 6, 2016. M.C., who was close friends with A.M. and C.K., explained that she was not close friends with R.K. Over the February weekend in question, all three female minors stayed the weekend with R.K. at R.K.'s parents' pole barn, which was a separate building near their house that did not have a bathroom.

¶ 16    On February 6, 2016, Winnie purchased alcohol for the minors, and defendant encouraged M.C. to consume "[s]hots of Fireball and beer." M.C. complied. Throughout the evening, M.C. used the bathroom in R.K.'s parents' home. On one occasion, however, as M.C. exited the bathroom, defendant was standing alone in the laundry room smoking a cigarette and asked M.C. to "come here and talk to me." As M.C. approached defendant, defendant began talking about M.C.'s mother. Defendant then gave M.C. a two-armed hug and "put his hands on [her] butt." M.C. attempted to push defendant away, but "he pulled [her] close and then he put one arm up [her] shirt [over her bra] and then he grabbed [her] down there." Following this incident, M.C. ran to the pole barn crying and told her friends that she was "just drunk and emotional." M.C. blamed herself after the incident because she should have known defendant was "crooked," given he was a "grown man giving us alcohol."

¶ 17    Following the weekend, rumors circulated at school that defendant had molested M.C. At some point, R.K., defendant, and Winnie called M.C. to question her about the rumors. Shortly thereafter, DCFS conducted a forensic interview with M.C. on March 30,

6

2016. M.C. admitted that she lied to the interviewer when she stated that defendant did not provide her alcohol, touch her, or otherwise make her uncomfortable in February 2016. M.C. testified that she was dishonest with DCFS because she "was scared," embarrassed, and "didn't want to lose [her] friend." In her second interview with DCFS in April 2016, however, M.C. "told the truth about what happened." According to M.C., defendant and Winnie provided alcohol to her and the other female minors. Although M.C. was intoxicated after consuming eight shots of alcohol, she "knew what was going on" that evening.

¶ 18 On cross-examination, defense counsel questioned M.C. about the DCFS interview on March 30, 2016, where Brooke Budny and Deputy McWard were present. Again, M.C. acknowledged having said in that interview that she felt safe at R.K.'s home and that defendant did not molest her, make her feel uncomfortable, or give her alcohol. M.C. also acknowledged stating that she was unaware of how the rumors started. Despite this, M.C. reiterated that she had lied during the first interview. Defense counsel next questioned M.C. about the second interview with DCFS. M.C. acknowledged having said that both defendant and Winnie had provided alcohol to her and that she ran back to her friends in an emotional state after the incident happened. Lastly, defense counsel questioned M.C. about the order of protection she filed against defendant in Macon County, Illinois. M.C. admitted that the order of protection did not state that alcohol was present or consumed, that defendant had grabbed her buttocks or any other area of her body, or that other minors were present on February 6, 2016. M.C. explained on redirect

7

that she did not believe she had to provide every detail to obtain an order of protection. M.C. acknowledged on recross that the order of protection was never entered.

¶ 19                                     B. Testimony of R.K.

¶ 20   R.K. testified to the following. Defendant, R.K.'s stepfather, had been in her life since she was four years old. In the past, she considered defendant to be a "cool guy" who had become a father figure to her. On February 6, 2016, R.K., who was 17 years old, had friends over to her parents' pole barn. R.K. testified that she was not allowed to drink in front of adults, so after the adults left for the night, R.K., A.M., M.C., and C.K. drank alcohol with R.K.'s parents in the pole barn. At some point during the evening, M.C. used the bathroom in R.K.'s parents' house. When M.C. returned to the pole barn, she "wouldn't stop crying" and "wouldn't talk to anyone." R.K. testified that she "had a gut feeling something had happened with" defendant, so she "basically forced" M.C. to tell her what had happened sometime after the incident.

¶ 21   The State then questioned R.K. about her past relationship with defendant. When R.K. was 13 years old she moved to Sangamon County, Illinois, with Winnie and defendant. R.K. stated that defendant "started getting more physical and verbally mean" following the move. The State then asked R.K. to explain what she meant. The following colloquy took place:

> "A. Well, every time I would get in trouble, he would get super angry and take it out—Um, there was, for instance, there was a time when I had a secret phone, which was my fault. And he just went—He went ballistic and grabbed me by my shirt and just started dragging me and he—
> Q. Okay. Did you say dragging you?
> A. Yeah. He dragged me up the stairs by my shirt and ripped it one day.
> Q. Okay. Were there other times that he was physical with you?

8

A. Yes.

Q. Can you describe some of those that you remember?

A. There was one day when I was sitting in my room, because we had already been arguing, and we usually would go to our rooms to calm and separate. And I remember I'm sitting there[,] and I wouldn't say anything to him, he kept hitting me in the lip, and I had a bruised lip.

Q. Okay. Is that the incident that you reported to the *** Sheriff's Office?

A. Yeah."

Defense counsel did not object.

¶ 22 After the State had elicited the previously mentioned events of physical abuse from R.K., the State, again, asked R.K. whether she recalled "any other times that [defendant] was physical to [her]?" Defense counsel did not object. R.K. recounted "one of the very first times" defendant was physically abusive with her was when he "hit [her] and [she] hit [her] head off the stove and *** went into a seizure" after she "look[ed] at him wrong." Defense counsel did not object but interrupted to request a sidebar.

¶ 23 During the sidebar, defense counsel expressed his concern that R.K.'s testimony, especially the stove incident, included undisclosed other-crimes evidence. Defense counsel stated the following:

"My understanding was we were talking about the [M.C.] incident and the other evidence of June 28th, the lip, and then the 2012, alleged sexual contact. And other than that, we weren't talking about anything else."

Contrary to the State's assertions, defense counsel did not "recall seeing anything about a phone or a stove." The circuit court, treating defense counsel's interruption as an objection, "sustained the prior objection to the last question" and instructed the jury to disregard R.K.'s testimony regarding the stove incident.

9

¶ 24    The State then continued its direct examination of R.K. and, again, without objection from defense counsel, pursued its line of questioning regarding R.K.'s lip injury. In response to the State's questions, R.K. provided a more detailed account of the events surrounding her lip injury. On the day of the incident, R.K. recounted that she and defendant argued. After the argument ended, R.K. went to her room and sat on her bed. Defendant then entered her room, hit her multiple times in the lip, and then left her room. Shortly thereafter, defendant came back "even more worked up" and kicked R.K. while she was on the floor. Defense counsel did not object. R.K. and Winnie, who was present for the incident, did not report defendant's physical abuse until after he moved out of the home in July 2016. Prior to defendant moving out, R.K. ran away for one day in an attempt to get away from defendant. Additionally, R.K. testified that she had informed her friends that defendant was "physical" with her.

¶ 25    Next, R.K. testified about the 2012 sexual encounter with defendant when she was 12 years old. Defendant coerced R.K. to kiss him before he performed oral sex on her in his truck. During and after the incident, defendant told R.K. that their encounter was "normal" and "would just stay between us." Defendant also told R.K. that it was a "father-daughter thing." Additionally, R.K. and defendant started having "underwear races" when she was 12 years old. For nearly three years, R.K. and defendant would "completely strip down into [their] bra and underwear" to race each other across the house. "The "underwear races" ended because R.K. felt "uncomfortable" and "it was just getting weird."

¶ 26 On cross-examination, R.K. admitted that she told DCFS that she was sober and hanging out in her bedroom with her friends on the night of February 6, 2016. Additionally, R.K. recalled telling DCFS that she felt safe with Winnie and defendant. Defense counsel then asked R.K. the following question: "Do you recall telling Ms. Budny [a child protection investigator with DCFS] you had never told anyone that your dad had broken your ribs?" R.K. responded: "Yes."

¶ 27 Defense counsel, with reference to the order of protection R.K. had filed in Christian County, Illinois, asked R.K. if she told Winnie that defendant, in June 2016, had "pulled her by the hair, dragged [her] out to the hallway and kicked [her] multiple times." R.K. responded in the affirmative. Additionally, defense counsel questioned R.K. about the order of protection she had filed in Macon County, Illinois, which contained, unlike the order of protection filed in Christian County, sexual abuse allegations from 2012. Specifically, defense counsel asked the following question: "[Defendant] became upset with you and punched you in the face and kicked you, is that correct? Is that a fair summary of what [the order of protection] indicates?" R.K. responded in the affirmative.

¶ 28 Following defense counsel's cross-examination, the State asked R.K. if there had "been some incident involving your ribs [with defendant]?" R.K. responded: "Yes." R.K. further testified that she was too scared to go to the hospital after the incident or report defendant's abuse to DCFS. Additionally, R.K. ran away because she "didn't want to live there anymore" and "didn't want to be scared to go home."

11

¶ 30    C.K. testified to the following. C.K. confirmed that after defendant's adult friends had left R.K.'s parents' house, she drank alcohol in the pole barn on February 6, 2016. Defendant provided alcohol to C.K. throughout the night, saying: "Get drunk or go home." C.K. confirmed that M.C. was crying after she used the bathroom in defendant's home, and M.C. told C.K. that night that "she did not want to go back inside." That night, after defendant took C.K.'s keys, C.K. and M.C. slept together in R.K.'s bed because M.C. "didn't want to be left alone." According to C.K., after M.C. "puked all over herself," they went inside, and C.K. "put [M.C.] in the bath and laid her down for bed." The State asked C.K. if she recalled whether M.C. told her anything the next morning, and C.K. responded: "Just that she didn't want to go back there." Defense counsel objected on grounds of hearsay. The circuit court sustained the objection and instructed the jury to disregard C.K.'s last answer. The State rephrased the last question as follows: "Do you recall [M.C.] saying anything about [defendant] to you the next day?" C.K. answered saying "that [M.C.] didn't want to go back to [R.K.'s house]."

¶ 31    Next, the State questioned C.K. about her relationship with R.K. C.K. testified that, prior to defendant moving out of the home in July 2016, R.K. told her that defendant had physically abused her. There was no objection from defense counsel to this testimony. Next, the State presented C.K. with three pictures that depicted Winnie, R.K., M.C., and C.K. drinking alcohol on February 6, 2016 (People's Exhibits 1, 2, and 3). Defense counsel objected to the exhibits for a lack of foundation. The circuit court overruled the objection and allowed the State to publish the exhibits. On cross-

examination, C.K. confirmed that defendant was not pictured in People's Exhibits 1, 2, and 3. However, on redirect, C.K. stated that there had been a photo on Instagram of defendant at the party on February 6, 2016. Although C.K. tried her "hardest" to find this photo, she was unsuccessful.

¶ 32                                    D. A.M.'s Testimony

¶ 33    A.M. testified to the following. Similar to C.K., A.M. testified that she, too, had been drinking in defendant's pole barn after Winnie and defendant's adult friends left the party. A.M. recalled defendant talking to M.C. and giving her alcohol throughout the night. Next, the State inquired whether R.K. had ever told A.M. that defendant had abused her. After A.M. answered in the affirmative, defense counsel objected for a lack of foundation. The  circuit court overruled the objection. A.M. clarified that R.K. told her that defendant had physically abused her in the past. The State inquired further if R.K. had ever told A.M. about anything that had happened with defendant in the past when she was younger. A.M. answered in the affirmative. In describing R.K. and defendant's relationship, A.M. said defendant was "very controlling." Defense counsel objected for a lack of foundation. The court overruled the objection. Again, the State asked if A.M. "ever s[aw] any evidence of [defendant's physical abuse]?" A.M. responded that R.K. "came to school with a black eye before, and she also had her ribs bandaged up." Defense counsel objected on grounds of speculation. The court overruled the objection. Next, the State asked A.M. if R.K. ever talked about her injuries and who had caused them. A.M. stated that defendant had caused R.K.'s injuries. Defense counsel objected on grounds of

13

hearsay. Following a recess initiated by the court, the court sustained the objection and ordered the jury to disregard the last question.

¶ 34   Next, the State asked A.M. whether R.K. told her that defendant had physically abused R.K. during the time A.M. and R.K. had sleepovers in 2015 up until February 2016. A.M. stated: "[Y]eah. We were talking about it." Defense counsel objected on grounds of hearsay. The circuit court responded that the question only requires a yes or no response. A.M. stated yes. The State then asked A.M. if the conversations about physical abuse happened during sleepovers. A.M. responded that "all the time, like at school *** [and] any time that we were alone and like having serious conversations." The State then asked A.M. if she observed any injuries on R.K.'s body during the time that R.K. was telling her about the physical abuse. Defense counsel objected on grounds of leading. The court overruled the objection and instructed the jury that they could only consider A.M.'s answer to determine R.K.'s credibility as to whether R.K. made consistent disclosures of the alleged physical abuse. The State rephrased the question and asked A.M. if she ever saw any injuries on R.K.'s body. A.M., again, responded: "Yes, there would be bruises or she would go into specific detail *** of every little thing[,] like the arguments that would happen." Next, the State asked A.M. if R.K. ever told her about the underwear races. A.M. answered in the affirmative. Defense counsel made an objection on grounds of hearsay, and the court instructed the jury to consider this specific question and answer only in evaluating R.K.'s credibility in terms of her disclosure to A.M. The jury was instructed not to consider A.M.'s answer as to whether or not what R.K. "told [A.M.] was actually true."

14

¶ 35    On cross-examination, A.M. acknowledged that she drove with Winnie to pick up alcohol on February 6, 2016. A.M. testified that she never saw defendant touch M.C. anywhere inappropriately on her body on February 6, 2016, and that she never saw defendant inflict physical abuse on R.K. A.M. admitted that, despite R.K.'s injuries, she never saw how R.K. had sustained the injuries.

¶ 36                                E. Brooke Budny

¶ 37    Brooke Budny, a DCFS child protection investigator, testified to the following. Budny investigated allegations of abuse and neglect for DCFS. Budny recounted that M.C. had denied any wrongdoing by defendant in a previous interview with DCFS. After receiving a hotline call from M.C.'s school counselor, Budny contacted M.C. During a second interview, M.C., who was "very upset, very tearful most of the interview," disclosed that defendant had sexually abused her. M.C., in explaining why she initially lied to DCFS, stated that she was ashamed, embarrassed, and "felt that some aspect of it was her fault that she allowed herself to be in that situation."

¶ 38    On cross-examination, Budny acknowledged that M.C. had initially said that she felt safe with defendant and that the minors had only one drink on February 6, 2016. Budny did not recall M.C. crying during the first forensic interview. Again, Budny stated that M.C. lied to DCFS during the second interview because "she was scared of [defendant], because she knew him to be violent through [R.K.'s] disclosures to her."

¶ 39                            F. Deputy James McWard

¶ 40    Deputy James McWard testified to the following. Deputy McWard testified that M.C. told him that Winnie and defendant provided her alcohol on February 6, 2016, and

15

defendant had encouraged the female minors to take shots of Fireball. The State asked Deputy McWard if he had contacted defendant during his investigation. Deputy McWard answered in the affirmative. Following this questioning, the State asked Deputy McWard if defendant agreed to an interview with him for the purposes of the investigation. Defense counsel objected and requested a mistrial. The circuit court denied defense counsel's request for a mistrial but sustained the objection. The jury was instructed to disregard this line of questioning.

¶ 41    In the initial interview on March 30, 2016, Deputy McWard indicated that M.C. was emotional but denied that defendant had ever touched her or that Winnie and defendant knew of the underage drinking. According to Deputy McWard, he "believed her story on March 30." In a second interview in April 2016, M.C. admitted that defendant had inappropriately touched her. Defense counsel then highlighted inconsistencies in M.C.'s story in the March and April 2016 interviews regarding who was present on February 6, 2016. The State rested its case.

¶ 42                                    G. Jason Cummins

¶ 43    The defense called Jason Cummins, a supervisor for DCFS in Christian County, Illinois, to testify on behalf of defendant. R.K. told Cummins that the adults, not the minors, were drinking on February 6, 2016. R.K. stated that Winnie and defendant's adult friends left around 11 p.m., and the girls stayed inside her parents' home. The following colloquy took place:

> "Q. As part of your professional responsibilities, did you have any prior contact with [R.K.] and an allegation of neglect and abuse?
> A. Not with [R.K.] herself but with the parents I did, yes.

"Q. Okay. Do you recall what it was regarding?

A. Yes. *** [DCFS] is on an allegation system ***. They determine what allegation is appropriate. And there is *** a pre-determined set of interviews and a pre-determined course of action for the investigation that we need to follow. [Defendant] had at least a couple allegations of substantial risk of sexual harm, which is *** if you are an indicated sex offender or are on a sex offender registry.

Q. Did this specifically have anything to do with broken ribs?

A. No. That one, no."

Cummins responded that R.K. had told a sheriff's deputy, not DCFS, about her alleged broken ribs. However, when Budny followed up with R.K.'s doctor, there was no documentation that R.K. had broken ribs in the past.

¶ 44                    H. Brian and Rebecca Honeyman

¶ 45    Next, the defense called Brian and Rebecca Honeyman, personal acquaintances of defendant, to testify on behalf of defendant. Brian and Rebecca attended Winnie and defendant's party in February 2016. Both Brian and Rebecca testified that neither of them witnessed minors drinking alcohol or being inappropriately touched. Rebecca did not recall seeing a minor upset or emotional at the party. Brian testified that people normally left defendant's gatherings around midnight.

¶ 46                          I. William Brown

¶ 47    The defense called William Brown, a personal acquaintance and employee of defendant, to testify on behalf of defendant. Brown was at Winnie and defendant's home on February 5, 2016, and February 6, 2016, until after midnight on both evenings. Brown did not observe any inappropriate touching, underage drinking, or emotionally upset minors at the party. According to Brown, R.K. and her friends were outside riding on a Polaris ATV both nights.

¶ 48    On cross-examination, Brown acknowledged that he worked for defendant, and that the outcome of the case would impact his life. The State asked Brown if he knew Justin and Larry Danner. Brown confirmed that he was friends with the two men. Defense counsel objected and requested a sidebar. The circuit court overruled defense counsel's objection and denied the request for a sidebar. Brown testified that he had informed Detective Matthew Whetstone with the Macon County sheriff's office that Larry Danner had told him about a past allegation made by R.K. of defendant inappropriately touching her. Brown admitted that he did not report this information when Danner told him because he "didn't believe it." Without objection by defense counsel, the court instructed the jury that the previous answer could be considered in determining "any bias, motive, and credibility, etc. of this witness's testimony."

¶ 49    On redirect, Brown testified that he did not believe R.K.'s allegation that defendant had inappropriate touched her because "sometimes when she gets in trouble, she lies. She lies a lot." According to Brown, prior to 2016, R.K. had alleged that "[t]wo other kids *** had done the same thing to her and it was a lie." The State objected, and the circuit court overruled the objection. Based on her previous lies about being sexually molested, Brown did not go to the police. If Brown thought R.K.'s allegation against defendant was true, he claimed he would have gone straight to the police at the time Danner had informed him of the allegation. On recross, Brown acknowledged that he never talked to R.K. or R.K.'s alleged past abusers who she claimed had sexually molested her prior to 2016. Brown did not believe R.K.'s allegation against defendant because nothing ever came of her prior allegations.

18

¶ 50                                    J. Mark Beck

¶ 51    The defense called Mark Beck, a personal acquaintance of defendant, to testify on behalf of defendant. Beck attended defendant's party on February 5, 2016, and February 6, 2016, until sometime around midnight. Beck never saw a minor being inappropriately touched, offered alcohol, consuming alcohol, or emotionally upset either night. Beck testified that he voiced concern to defendant that R.K. and M.C. were friends, given M.C.'s family life.

¶ 52                              K. Detective Matthew Whetstone

¶ 53    Over defense counsel's objection, the State called Detective Whetstone as a rebuttal witness. In an effort to impeach Brown's testimony that R.K. was known to make false accusations, the State asked Detective Whetstone if R.K. had told him about a prior incident when someone, other than defendant, "had perpetrated on her." Detective Whetstone acknowledged that R.K. told him that she had been perpetrated on when she was nine years old in 2009 by defendant's friend, a Warrensburg police officer, who pled guilty and was sentenced to 10 years in prison. The case was a "well-known case in Macon County." The circuit court then instructed the jury that they could use Detective Whetstone's testimony in rebuttal to Brown's previous testimony for "purposes of determining the weight and credibility that you give to Bill Brown's testimony." On cross-examination, Detective Whetstone indicated that he did not personally investigate the 2009 case but had gained knowledge about the case through the circuit clerk's website and prior reports.

¶ 54 Following closing arguments, the jury was instructed, *inter alia*, that they "should disregard questions and exhibits which were withdrawn or to which objections were sustained. Any evidence that was received for a limited purpose should not be considered for any other purpose. You should disregard testimony which the Court has refused or stricken." Additionally, *inter alia* the jury was instructed of the following:

> "Evidence has been received that the defendant has been involved in offenses other than those charged in the Information. This evidence has been received on the issue of the defendant's propensity to commit the charged offense as it may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in those offenses, and if so, what weight should be given to this evidence on the issue of propensity."

Following deliberations, defendant was found guilty and convicted of criminal sexual abuse.

¶ 55 On October 13, 2017, defendant filed a motion for judgment notwithstanding the verdict, or in the alternative, a motion for a new trial,[1] arguing that he was denied a fair trial for three reasons: (1) the circuit court erred in granting the State's motion to admit other-crimes evidence of R.K.'s testimony of an alleged incident in 2012 between her and defendant; (2) Cummins, a defense witness, referenced that defendant was a registered sex offender, although defense counsel had informed Cummins prior to his testimony not to discuss that issue on the record; and (3) the court denied defense counsel's request for a mistrial when the State asked Deputy McWard if defendant had agreed to an interview with him for purposes of the investigation. Defense counsel attached an affidavit attesting

---

[1]Defendant incorrectly stated that he was found guilty of the offense of predatory criminal sexual assault. In an amended motion for a new trial, filed on November 2, 2017, defendant correctly stated that he had been found guilty of the offense of criminal sexual abuse.

that, prior to Cummins testifying, defense counsel spoke to Cummins and instructed him not to address defendant's status as a registered sex offender.

¶ 56    On November 2, 2017, the circuit court held defendant's sentencing hearing. At the outset, defense counsel addressed defendant's motion for judgment notwithstanding the verdict, or in the alternative, a motion for a new trial. In addressing Cummins' testimony that defendant was a registered sex offender, defense counsel explained that, even though the court had granted defendant's motion *in limine* concerning this matter, defense counsel "wasn't even clear as to what exactly Mr. Cummins had said at that point." Defense counsel explained that he did not realize "the actual words of sexual harm or sex offender registry were actually mentioned" until after he received and read through the transcript. He further stated: "In hindsight, I should have asked for a mistrial because it was in violation of the Motion In Limine." Moreover, defense counsel argued that his request for a mistrial was appropriate in light of the State's question to Deputy McWard as to whether defendant had agreed to an interview with him for purposes of the investigation. In response, the State argued that the court cured the issue concerning Deputy McWard's testimony with a limiting instruction for the jury to disregard the State's question. As it related to Cummins' testimony, the State argued that Cummins was a defense witness and that "the Court cured the issue." The State also argued that defense counsel's failure to promptly request a mistrial following Cummins' testimony was an issue for appeal purposes.

¶ 57    Following argument by both parties, the circuit court denied defendant's motion. As it related to the testimonies of Cummins and Deputy McWard, the court stated that it

was under the belief that "those issues were cured by the Court's instructions to the Jury." Defendant was subsequently sentenced to seven years in prison to be followed by four years of MSR.[2]

¶ 58　On December 1, 2017, defendant filed a motion to reconsider, which the circuit court denied following a hearing on January 4, 2018.[3] Defendant filed a timely notice of appeal.

¶ 59　　　　　　　　　　　　　　II. Analysis

¶ 60　On appeal, defendant alleges that defense counsel's defective performance deprived him of his constitutional right to effective assistance of counsel. In support, defendant argues that defense counsel's performance was deficient in several respects, including, *inter alia*, failing to object, or make timely and proper objections, to impermissible other-crimes evidence of physical abuse. Defendant also contends that defense counsel elicited testimony of physical abuse and evidence that defendant was a registered sex offender,[4] despite the circuit court's ruling that defendant's status as a sex offender and conviction for the triggering offense were inadmissible. Based on defense counsel's repeated errors, defendant argues he was denied a fair trial and a verdict worthy of confidence. We agree.

[2]On November 2, 2017, defendant was initially sentenced to seven years in Department of Corrections with two years of MSR; however, on November 7, 2017, the circuit court entered an amended sentencing order that reflects the correct sentence of seven years in Department of Corrrections with four years of MSR.

[3]A written order by the circuit court is not contained in the common law record on appeal; however, the court's docket entry of January 4, 2018, reflects that defendant's motion to reconsider was denied for reasons stated on the record.

[4]Defendant does not challenge the circuit court's pretrial decision to admit two allegations made by R.K. that (1) defendant performed oral sex on her when she was 12 years old and (2) R.K. and defendant engaged in "underwear races" by the encouragement of defendant.

22

¶ 61 A defendant alleging ineffective assistance of counsel must establish that his attorney's performance fell below an objective standard of reasonableness and that this deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to succeed on an ineffective assistance of counsel claim, a defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Snowden*, 2011 IL App (1st) 092117, ¶ 70. A defendant is entitled to competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of themselves, render the representation ineffective. *People v. Nowicki*, 385 Ill. App. 3d 53, 82 (2008).

¶ 62 Additionally, a defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687. A reasonable probability is one that sufficiently undermines confidence in the outcome of the proceeding. *People v. Barrow*, 195 Ill. 2d 506, 534 (2001). The defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation. *People v. Holman*, 164 Ill. 2d 356, 369 (1995). The defendant's failure to satisfy either prong of *Strickland* defeats an ineffective assistance claim. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). If a reviewing court finds that the defendant did not suffer prejudice, it need not decide whether counsel's performance was constitutionally deficient. *People v. Buss*, 187 Ill. 2d 144, 213 (1999).

¶ 63 Given the long list of failures defendant is claiming on appeal, we first begin with the question of whether defense counsel's failures to object, or make timely and proper objections, to impermissible other-crimes evidence of physical abuse of R.K. might have

been the product of sound trial strategy. We note that it is well settled that an attorney may forego an objection or a motion to strike for strategic reasons. *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991) ("As a general rule, trial strategy encompasses decisions such as what matters to object to and when to object."); see *People v. Evans*, 209 Ill. 2d 194, 221 (2004); *People v. Leger*, 149 Ill. 2d 355, 396-97 (1992); *People v. Owens*, 372 Ill. App. 3d 616, 625 (2007). A strong presumption exists that the action or inaction by counsel was the product of sound trial strategy. *People v. Davis*, 2014 IL App (4th) 121040, ¶¶ 15, 19.

¶ 64    Defendant claims that the State introduced prejudicial evidence of uncharged, past physical abuse involving R.K., a propensity witness, which defendant argues served no legitimate purpose, or purposes, for admission, aside from persuading the jury that defendant had a propensity to commit crimes. In particular, without objection, the State elicited R.K.'s testimony of several events of physical abuse, including: (1) that defendant went "ballistic" and "dragged [R.K.] up the stairs by [her] shirt and ripped it" after he discovered R.K.'s secret phone; (2) on June 28, 2016, defendant bruised R.K.'s lip after he hit her multiple times; and (3) after defendant repeatedly hit R.K. in the lip on June 28, 2016, he became "even more worked up" and subsequently kicked her while she was lying on the floor in her bedroom. Moreover, defendant contends that defense counsel erred when he "opened the door" on cross-examination to an incident where R.K. testified that defendant had broken her ribs. Defendant argues that these statements are highly prejudicial and impermissible evidence of propensity.

24

¶ 65    Additionally, defendant contends that defense counsel failed to timely object to the State's questioning of R.K. regarding physical abuse that occurred from the time R.K. moved to Sangamon County, Illinois, and defendant moved out of the family home in July 2016. Specifically, after the State had elicited the events of physical abuse, as outlined above, the State asked R.K. whether she recalled "any other times that [defendant] was physical to you?" Defense counsel did not object. According to R.K., in 2015, defendant hit her because she "looked at him wrong." As a result, R.K. hit her head on a stove and suffered a seizure. Defendant argues that this testimony was highly prejudicial and served no legitimate evidentiary purpose or purposes. As it relates to the same testimony given by R.K., defendant also argues that the circuit court's attempt to remedy defense counsel's failure to object was insufficient where it simply instructed the jury to disregard the testimony. Specifically, after R.K. finished answering the State's question, defense counsel requested a sidebar, informing the court that the State's question had elicited other-crimes evidence that had not been previously disclosed. Following the sidebar, the court, treating defense counsel's sidebar comments as an objection, informed the jury that it was sustaining "the prior objection to the last question" and further directed the jury to disregard the question and answer. Given this highly prejudicial and "startling" testimony, defendant argues that expecting a jury to disregard it is "simply asking for the impossible."

¶ 66    As our supreme court has long noted, other-crimes evidence is not admissible if it is relevant merely to establish defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)

25

("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith ***."). Evidence suggesting or implying that the defendant has engaged in prior criminal activity should not be admitted unless the evidence is relevant. *People v. Lewis*, 165 Ill. 2d 305, 345-46 (1995). "Courts generally prohibit the admission of this evidence to protect against the jury convicting a defendant because he or she is a bad person deserving punishment." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (citing *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998)). While other-crimes evidence may be admissible for other purposes, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)), such evidence will be disallowed where its prejudicial impact substantially outweighs its probative value. *People v. Chapman*, 2012 IL 111896, ¶ 19.

¶ 67    In the present case, defense counsel first articulated the defense strategy in his opening statement and continued throughout the trial. To discredit the sexual abuse allegations made by M.C., defense counsel highlighted in his opening statement the inconsistent and changing witness accounts to certain details, such as who provided the alcohol, and that M.C. had denied being sexually abused by defendant in an initial interview with DCFS on March 30, 2016. Likewise, to undermine R.K.'s testimony that defendant performed oral sex on her in 2012 and had encouraged her to engage in "underwear races," defense counsel advocated that R.K. had later fabricated these events in 2016 because defendant and Winnie had split up and defendant had left the marital residence. Although the State did not mention in its opening statement that defendant had

26

physically abused R.K., revealing only that M.C. was unaware that defendant had "perpetrated on [R.K.]," defense counsel informed the jury that there would be testimony concerning physical abuse.

¶ 68   The State asserts on appeal that defense counsel provided objectively reasonable assistance because his decision not to object was based on a defense strategy. In support, the State asserts that the sidebar conversations demonstrate that the State had previously disclosed to defense counsel the June 28, 2016, lip injury, and further, that it can be reasonably inferred that defense counsel acquiesced to the State's use of this evidence at trial. As such, the State takes the position that the decision by defense counsel not to object was "presumably part of [defense counsel's] trial strategy." The State also asserts that defense counsel provided objectively reasonable assistance when he objected to R.K.'s testimony concerning undisclosed incidents of physical abuse, specifically, the secret phone and stove incidents, during sidebar. Alternatively, the State asserts that, even if defense counsel's performance was deficient, defendant has failed to show prejudice under the *Strickland* test.

¶ 69   While we agree with the State that defense counsel did not to object to R.K.'s testimony about the lip injury to support his argument that R.K. had fabricated the sexual abuse allegations in 2016, we are unconvinced that it was sound strategy. Upon learning of prior physical abuse allegations levied against a defendant, a competent defense attorney would have sought to keep this information away from the jury, either by filing a pretrial motion *in limine* or, at the very least, objecting at trial. The reason for either course of action is obvious. A jury presented with such evidence might convict a

27

defendant solely because it believes the defendant is a bad person who deserves punishment. *Donoho*, 204 Ill. 2d at 170.

¶ 70 In our view, R.K.'s testimony of specific and repeated instances of alleged physical abuse—lip, stove, and phone incidents—consisted of unfairly prejudicial other-crimes evidence that would have been excluded by the circuit court had defense counsel objected to its admission. There is no question that such evidence presented little or no probative value. Consequently, in our opinion, no competent defense counsel would have willingly risked the potential prejudicial impact that such otherwise excludable evidence might have on a jury in an effort to discredit a witness's statements concerning prior sexual abuse. Under the circumstances, we agree with defendant that the presumption that defense counsel's performance was the product of sound trial strategy has been sufficiently overcome. To the extent defense counsel acquiesced to its admission, counsel's performance was deficient.

¶ 71 Additionally, R.K.'s prejudicial testimony concerning past physical abuse was further magnified when defense counsel elicited inflammatory evidence related to additional physical injury. Specifically, on cross-examination, defense counsel asked R.K. whether she recalled "telling Budny that [she] had never told anyone that [her] dad had broken [her] ribs?" This court can discern no reasonable strategic reason for willingly eliciting such inflammatory information. The State then elicited more details of the events surrounding this injury on R.K.'s redirect, and, additionally, both defense counsel and the State elicited repeated references to this injury in the testimonies of A.M., Budny, and Cummins. We find it particularly troubling that neither party displayed a professional

28

knowledge of the evidentiary restrictions placed on the use of other-crimes evidence in a criminal trial and the potential harm that those restrictions are designed to prevent. Here, again, defense counsel's performance undeniably fell below an objective standard of reasonableness.

¶ 72　Defendant next argues that defense counsel was deficient in failing to timely respond after the jury learned of defendant's status as a registered sex offender. In particular, defense counsel asked Cummins on direct examination if he could recall any prior contact with R.K.'s parents. Cummins responded that "[defendant] had at least a couple allegations of substantial risk of sexual harm, which is *** if you are an indicated sex offender or are on a sex offender registry." Although the circuit court had previously ruled defendant's sex offender status inadmissible, defense counsel failed to ask the court to strike the testimony or move for a mistrial. At defendant's sentencing hearing, however, defense counsel asserted that he did not hear Cummins disclose defendant's sex offender status at the time of the testimony. Instead, defense counsel first learned of this testimony while reading the trial transcript. Due to defense counsel's inaction, the jury was permitted to consider defendant's sex offender status and was left to speculate as to the triggering offense. Here, again, defense counsel's performance fell below an objective standard of reasonableness.

¶ 73　Having identified numerous deficiencies in defense counsel's performance and concluded that defense counsel's performance fell below an objective standard of reasonableness, we next must consider whether defendant has proven prejudice. See *Strickland*, 466 U.S. at 687. After a careful review of the evidence, we agree with

defendant that this case is not one that consists of overwhelming evidence against defendant. The alleged victim, M.C., the only eyewitness of the reported sexual abuse by defendant, initially denied that the abuse occurred in her first interview. M.C. subsequently testified that she had initially lied to DCFS in the first interview, saying that defendant did not molest her, make her feel uncomfortable, or give her alcohol in February 2016. Additionally, M.C. also stated in the first interview that she felt safe at R.K.'s home.

¶ 74    Moreover, there is conflicting evidence concerning the amount of alcohol that M.C. consumed and M.C.'s level of intoxication at the time of the alleged sexual abuse. M.C. initially claimed, unbeknownst to defendant, that M.C., R.K., A.M., and C.K. had each consumed only one drink. However, M.C. later claimed that she was intoxicated after she consumed eight shots of Fireball at the encouragement of defendant. Despite her admitted intoxication that evening, M.C. testified that she "knew what was going on." C.K., on the other hand, testified that after M.C. "puked all over herself," they went inside, and C.K. "put [M.C.] in the bath and laid her down for bed." Lastly, although R.K.'s testimony of prior sexual abuse was admitted to demonstrate defendant's propensity to commit sex crimes against minors, R.K. did not disclose the alleged 2012 sexual abuse until after defendant moved out of the marital residence in July 2016 following the incident with M.C. Furthermore, defendant made no admissions concerning the separate sexual abuse allegations made by M.C. and R.K.

¶ 75    In light of the potential weaknesses in the State's evidence, the repeated admission of impermissible other-crimes evidence, as identified above, rendered the result of the

proceeding unreliable. This is especially true because R.K.'s testimony of physical abuse became a theme throughout the trial and the focus in the testimonies of other witnesses. Given that R.K.'s testimony concerned both physical and sexual abuse, it is likely that the jurors were confused as to the limited evidentiary purpose of such statements. Additionally, the jury likely gave weight to defendant's status as a registered sex offender, which the circuit court had previously determined was inadmissible on the issue of propensity under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2014)). Given the totality of evidence, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, defendant has met his burden of demonstrating prejudice under *Strickland*. See *Strickland*, 466 U.S. at 694. Accordingly, we find that defendant was denied effective assistance of counsel. Given our resolution of this issue, we need not address defendant's other contentions on appeal.

¶ 76                                   III. Conclusion

¶ 77    Based on the foregoing, defense counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, absent counsel's deficient representation, the outcome of the trial would have been different. We, therefore, find that defendant was denied effective assistance of counsel. Accordingly, we reverse the judgment of the circuit court of Christian County and remand the cause for a new trial.


¶ 78    Reversed and remanded.